IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

JUDY D. JACOB,

      Plaintiff,

  v.

JO ANNE B. BARNHART,
COMMISSIONER OF
SOCIAL SECURITY
ADMINISTRATION,

      Defendant.

HONORABLE JEROME B. SIMANDLE

CIVIL NO. 05-3826

**OPINION**

APPEARANCES:

Alan H. Polonsky, Esquire
POLONSKY & POLONSKY
512 South White Horse Pike
Audubon, NJ 08106
    Attorney for Plaintiff

Christopher J. Christie
United States Attorney
    By:  Gina N. Shin
        Special Assistant United States Attorney
Social Security Administration
Office of the General Counsel
26 Federal Plaza, Suite 3904
New York, NY 10278
    Attorneys for Defendant

**SIMANDLE**, District Judge:

This matter comes before the Court pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g), to review the final decision of the Commissioner of the Social Security Administration, denying the application of Plaintiff, Judy D. Jacob, for disability insurance benefits under

Title II of the Social Security Act.  See 42 U.S.C. § 401, et seq.  This Court must determine: (1) whether the Administrative Law Judge properly determined the Plaintiff's psychological impairment was not "severe;" (2) whether the Administrative Law Judge properly determined the Plaintiff's condition did not meet the requirements of a listed impairment; (3) whether the Administrative Law Judge properly determined the Plaintiff's residual functional capacity; and (4) whether the Administrative Law Judge properly elicited Vocational Expert Testimony.  For the reasons stated below, this Court will affirm the decision of the Commissioner denying Plaintiff's application for Disability Insurance Benefits.

**I. Background**

    A.   Procedural History

On July 8, 2003, Plaintiff, Judy D. Jacob (the "Plaintiff"), filed applications for a period of disability and Disability Insurance Benefits ("DIB") alleging disability, commencing on December 30, 2002 (R. at 14), due to anxiety, back pain, and pain in her right leg. (R. at 15, 78, 81-82, 107, 127.)  These applications were denied on initial consideration (R. at 46-48) and on reconsideration. (R. at 55-57.)  A hearing was requested and held before an Administrative Law Judge ("ALJ") on April 13, 2005. (R. at 14, 329-52.)

ALJ Paula Garrety conducted a hearing and, on May 26, 2005,

2

issued a decision denying Plaintiff's application for benefits.
(R. at 11-24.)  Performing the five-step evaluation pursuant to
20 C.F.R. § 404.1520, ALJ Garrety found first that the Plaintiff
had not engaged in substantial gainful activity since the onset
of the alleged disability on December 30, 2003. (R. at 15.)
Assessing the medical severity of Plaintiff's impairments, ALJ
Garrety then held that Plaintiff's anxiety disorder was not a
"severe" impairment because it did not impair the Plaintiff's
ability to perform basic work activities. (R. at 15-17.)  While
the ALJ's ruling found the anxiety disorder to be less than
severe, the ALJ continued to evaluate the impact of the
psychological impairment on the Plaintiff's disability claim. (R.
at 16-17.)  In doing so, while performing step 3 analysis, the
ALJ concluded that the Plaintiff's psychological and physical
conditions, however severe, did not meet the requirements for the
Listing of Impairments. (R. at 17.)  Specifically, ALJ Garrety
found that "[t]he medical evidence indicates that the claimant
has impairments that are 'severe' within the meaning of the
regulations but not 'severe' enough, either singly or in
combination, to meet or medically equal one of the impairments
listed in Appendix 1, Subpart P., Regulation No. 4."  In
assessing Step Four of the sequential analysis, Judge Garrety
then held the impairments were severe enough to prevent the
Plaintiff from returning to work as a cocktail waitress. (R. at

18-21.)

Finding that the Plaintiff could no longer perform her prior job, Judge Garrety then considered whether the Plaintiff retained the ability to perform work in other capacities ("residual functional capacity")(Step Five analysis). (R. at 18-23.)  In determining the Plaintiff's residual functional capacity, the ALJ considered the Plaintiff's subjective complaints of pain, the Medical-Vocational guidelines, and the testimony of a Vocational Expert. (Id.)  After determining the Plaintiff's subjective complaints of pain were not supported by objective medical evidence, the ALJ used the Plaintiff's list of "severe" impairments to determine whether there was any work that she might perform under the Medical-Vocational guidelines of 20 C.F.R. § 404.1567 (2006). (R. at 18-21.)  Using the Medical-Vocational guidelines as a framework and based on the Plaintiff's residual functional capacity, the ALJ found the Plaintiff was capable of performing "a significant range of sedentary work".[1] (R. at 21-22.)  The ALJ then asked the Vocational Expert whether a hypothetical person of the Plaintiff's age, education, past relevant work experience, and residual functional capacity would be able to perform work. (R. at 22-23.)  The Vocational Expert testified that several positions existed in the regional economy

---

[1]  Sedentary work involves lifting no more than ten pounds at a time and occasionally lifting and carrying articles like docket files, ledgers or small tools. (R. at 22.)

4

for a person able to perform sedentary work where they could alternate between sitting and standing. (Id.)  Therefore, based on the testimony of the Vocational Expert and the guidance of the Medical-Vocational guidelines, the ALJ concluded the Plaintiff retained the capacity for sedentary work, and that "there are a significant number of jobs in the national economy that she could perform" and therefore denied the Plaintiff's disability claim. (R. at 21-23.)

Plaintiff then filed a request for review of the ALJ's decision to the Appeals Council on June 23, 2005. (R. at 325-328.)  The request for further review was denied on July 14, 2005. (R. at 5-7.)  Plaintiff then filed the present action with this Court on August 1, 2005.

B. Evidence in the Record

1. Plaintiff's Testimony

Plaintiff is a resident of Mantua, New Jersey (R. at 343) who was 34 years old at the time of her hearing before the ALJ. (R. at 333.)  Plaintiff has a high school education plus three years of college. (R. at 334.)  Plaintiff testified that she lives alone in a second floor condominium without an elevator and that she can use the stairs, but not without experiencing pain in her knee and back. (R. at 334, 342.)

During the hearing before the ALJ, Plaintiff testified that she is able to drive short distances and to run errands locally.

(R. at 334, 337-39.)  Plaintiff shops for small quantities of groceries on her own, but relies on her parents to bring heavier items up the stairs to her condominium. (R. at 338-39.)  When asked by the ALJ, the Plaintiff admitted to having traveled for more than 20 minutes on two occasions in the past year -- once driving her grandmother to Atlantic City and another time to a funeral out of town. (R. at 339.)  She testified that after both trips she felt exhausted and laid around throughout the following day. (Id.)

At the hearing, Plaintiff also explained she is capable of performing housework, including making her bed and feeding her dog. (R. at 336.)  However, after doing 20 or 30 minutes of such work, she needs to rest and can only get relief by "lying down with [her] legs up". (Id.)  She also attempts to maintain social connections by spending time visiting with her family and friends. (R. at 337-38.)  Plaintiff tries to dine with her friends once or twice a month, but states she can only be social for short periods of time (three hours at the most) because the sitting and standing makes her back hurt. (R. at 338.)

At the time of the hearing, Plaintiff explained she last worked as a cocktail server at an Atlantic City casino. (R. at 334-335.)  She stopped working on December 31, 2002 because of back pain and has not worked since. (Id.)  The Plaintiff also testified that she supports herself on income from her parents

6

and family members. (Id.)  According to the Disability Report
(Form SSA-3368), Plaintiff has never worked in any position
besides her employment as a cocktail server. (R. at 78.)

After experiencing back pain on the job, Plaintiff sought a
medical diagnosis from an orthopedic surgeon. (R. at 335.)  She
testified that the orthopedic surgeon ordered an MRI and after
reviewing the results, allegedly advised Plaintiff to "stop doing
whatever hurts [her] back immediately or [she] could be
paralyzed." (Id.)  The Plaintiff underwent surgery on her back in
April of 2003. (R. at 335.)

In addition to the injury to her back, Plaintiff testified
to having broken her femur. (R. at 338.)  She explained that
doctors had inserted a metal rod from the bottom of her hip, two
screws in the knee, a screw in the upper thigh, and six screws in
her back in an attempt to solve her femur and back problems. (R.
at 338.)  Since her surgery, the Plaintiff explained she has been
prescribed physical therapy and medication to deal with the pain.
(R. at 335-336.)

Plaintiff underwent physical therapy and was released to a
home program. (R. at 336.)  As a part of her home program, she
works out at a gym three days per week. (Id.)  While at the gym,
Plaintiff lifts light weights with her back supported and walks
on a treadmill at a constant pace for about 30 minutes. (R. at
337.)  Plaintiff testified that she can use the treadmill without

pain, but that when she stops walking her back is in severe pain. (Id.)  Plaintiff also explained that she continues her work out routine because working out and acupuncture are the only things that seem to help. (Id.)  In addition to working out, Plaintiff testified she attends a yoga class once a week for stress relief, but she can only perform half of the positions. (Id.)

Throughout her testimony, Plaintiff repeatedly stated that the pain from her back and knee leaves her exhausted.  She explained to the ALJ that she sleeps quite a bit, is "just exhausted all the time," and that it takes so much energy out of her to do daily activities. (R. at 335.)  On days when Plaintiff attends physical therapy, therapy uses all of her energy. (R. at 336.)  Finally, when describing the two excursions outside of a 20 mile radius from her home, the Plaintiff stated the next day she was "wiped out" and she felt like she was sick. (R. at 339.)

In addition to the exhaustion, Plaintiff testified that her back and knee problems leave her generally in a state of pain. At the hearing, she testified that sitting or standing too long makes her "back start[] to throb" and makes her legs hurt. (R. at 336.)  She reported that whenever she feels stressed, a throbbing pain goes through her back. (R. at 337.)  Some mornings, when her feet hit the floor, Plaintiff feels a numbing pain. (Id.) Plaintiff also stated she has sensitivity to weather because "when it rains, my back aches, but my whole body feels like it

8

was hit by a truck." (R. at 338.)

Finally, at the hearing Plaintiff described her various states of pain and pain management techniques.  Plaintiff testified that the type of pain changes and, depending on the day, she experiences sharp pain, nagging pain, a stabbing pain in the bone, and sometimes pain that feels like a pinch. (R. at 337, 340.)  Generally, Plaintiff uses acupuncture for pain management. (R. at 340.)  Doctors prescribed Hydrocodone for the pain, but Plaintiff stated she tries not to take it because she fears becoming addicted. (Id.)  She also complained that the Hydrocodone left her feeling "kind of drugged" and like she "didn't have a clear head." (R. at 341.)  Plaintiff also testified that she has an addition prescription for Prozac, Xanax, and Trazodone from Dr. Camacho to treat her anxiety. (R. at 340.)

### 2. Testimony of Richard Blaine, Vocational Expert

At the hearing, the ALJ utilized the testimony of a Vocational Expert, Richard Blaine, to determine the Plaintiff's ability to perform work. (R. at 344-50.)  To elicit the Vocational Expert's opinion about the Plaintiff's ability to perform work, the ALJ posed a hypothetical based upon an individual of Plaintiff's age, education, past work history, and list of "severe" impairments. (R. at 343.)  The ALJ asked the Vocational Expert whether such an individual, who was capable of

9

performing sedentary work (allowing for alternating positions at will ("sit/stand option")), had the ability to work as a cocktail waitress. (Id.)  The Vocational Expert testified that an individual with such limitations could not work as a cocktail waitress, but could perform other work available in the region. (R. at 344.)  The Vocational Expert stated that an individual limited to "sedentary work allowing for alternating positions at will" would not be able to work as a cocktail waitress because such a job requires her to "be on her feet for basically all of her work shift." (R. at 343.)  However, the Vocational Expert stated that such limitations did not preclude Plaintiff from gaining employment because many sedentary jobs existed in the region with a "sit/stand option."[2] (R. at 344.)  According to the Vocational Expert, thousands of such "sit/stand option" employment positions were available in the region, including positions such as a packer (1,800 available regionally), general office clerk (2500 available regionally), or telephone worker (700 available regionally). (Id.)

     3. Medical Reports

        a. Anxiety Disorder

――――――

[2] Positions with a sit/stand option would allow the individual to alternate between sitting and standing at will. (Id.)  When asked about the routine at such jobs, the Vocational Expert explained that workers usually remained in a specified location where they would have the option to stand or sit on a stool or chair at will. (Id.)

10

Plaintiff started seeing a Psychiatrist, Dr. Brenda Camacho, for concerns about anxiety and sadness. (R. at 160-84, 224-29.) Dr. Camacho's treatment notes indicate the doctor first saw Plaintiff on August 26, 1997. (R. at 257.)  At the first session with Dr. Camacho, Plaintiff testified that she was feeling depressed and that she was "usually an anxious person." (R. at 180-81.)  After the exam, Dr. Camacho reported the Plaintiff's speech was clear and goal directed, although pressured at some times and that Plaintiff's concentration, memory, judgment, and insight were good. (R. at 183.)  Dr. Camacho recommended the Plaintiff begin taking an anti-depressant, Zoloft, to treat the psychological conditions. (Id.)

By the fall of 2003, the Plaintiff had switched to Prozac and Xanax and was steadily lowering the dose of medication taken daily. (R. at 225-26.)  Since starting a routine of medication, the Plaintiff discussed feeling depressed a few times (R. at 166-67, 227.), but has generally denied depression. (R. at 162-68, 172, 226, 228-29.)  In early 2004, Dr. Camacho's notes indicate the Plaintiff lowered her dosage of Prozac and reported that she was doing fine and noticed no difference. (R. at 226-27.)  A few months later, Plaintiff reported having trouble sleeping. (R. at 227.)  Dr. Camacho prescribed Trazodone and during the next several visits Plaintiff reported no more problems sleeping, but that she felt anxious since the bout of sleeplessness. (R. at

11

227-28.)  However, Dr. Camacho noted that the Plaintiff reported

no side-effects from the medication and appeared responsive,

pleasant, and well-groomed with good eye contact. (Id.)  Dr.

Camacho's notes from late 2004-2005 state the Plaintiff was

stable, responsive, and that the Plaintiff reported she was

"okay," "pretty good," and "fine." (R. at 228-29.)

     Plaintiff also underwent a consultative appointment with Dr.

Lawrence G. Mintzer on September 8, 2003. (R. at 185-89.)  In his

complete mental status examination report, Dr. Mintzer noted

Plaintiff had never been psychiatrically hospitalized, but that

her family had a history of emotional instability and anxiety.

(R. at 187.)  In addition, Plaintiff told Dr. Mintzer that both

her mother and father have problems with anxiety, but neither has

sought treatment. (Id.)

     Although Plaintiff has taken anxiety medication since 1997,

Dr. Mintzer's records show that she has no difficulty with

cooking, cleaning, grocery shopping for small items and other

personal care tasks. (R. at 186-87.)  During Dr. Mintzer's

consultation, Plaintiff explained that she gets along fine with

people, socializes with family and friends, but does not like

being in crowds. (R. at 187-88.)

     When testing for mental acuity and emotional state, Dr.

Mintzer's notes indicate Plaintiff had general mental clarity and

was emotionally stable.  In addition, the Plaintiff's thought

processes were goal orientated and her abstract thinking was good. (Id.)  However, when testing concentration ability, Plaintiff responded negatively, expressed feeling pressured, and told the doctor "I can't do this." (R. at 188.)  As a result of this interaction, Dr. Mintzer rated the Plaintiff's concentration level as "fair to poor".[3] (Id.)

Based on his discussion with the Plaintiff, Dr. Mintzer reported Plaintiff suffered from "generalized anxiety disorder" and her Global Assessment of Functioning ("GAF") score was 58.[4] (R. at 189.)  However, Dr. Mintzer concluded that the Plaintiff's limitations were mostly due to physical health problems. (Id.)

In addition to Dr. Camacho and Dr. Mintzer's examinations, the Plaintiff was also evaluated by a State agency, which concluded the Plaintiff's anxiety condition constituted a non-severe impairment. (R. at 196-209.)

---

[3] Dr. Mintzer's report of Plaintiff's history with anxiety mirrors Dr. Camacho's notes.  The Plaintiff explained she has had a problem with anxiety for many years, but did not feel depressed (R. at 186-87.)  Describing the anxiety to Dr. Mintzer, the Plaintiff said, "[i]t felt like my nerves were jumping out of my skin, and then it made me feel exhausted." (R. at 186.)  Plaintiff also told the doctor that since she had left work her anxiety had lessened and she thinks working at the casino had a lot to do with her anxiety. (Id.)

[4] A Global Assessment of Functioning score of 58 corresponds to "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders 34 (4th ed. 2000).

b. Spinal Injury

In December of 2002, Plaintiff was treated by Dr. Anthony D. Villare, D.O., for lower back pain she had been experiencing for three months. (R. at 133-35.)  MRI and multiple x-rays of her back revealed degenerative arthritis and degenerative disc disease at L5-S1 with a grade 2-3 spondylolisthesis causing bilateral foraminal stenosis. (R. at 133.)  X-rays of the Plaintiff's lumbar spine showed "grade 2-3 spondylolisthesis of L5 on S1" (R. at 134.), meaning that the Plaintiff's fifth lumbar vertebrae ("L5") had shifted forward over the top surface of the first sacral vertebra ("S1"). 5 J.E. Schmidt, Attorneys' Dictionary of Medicine and Word Finder, S-262 (2005).  The x-ray showed the spondylolisthesis was associated with bilateral pars interarticularis defects, but showed only marginal anterior slippage. (Id.)  The MRI confirmed spondylolisthesis of L5 on S1 and also showed "associated degenerative disc disease and Modic type one degenerative marrow changes at the L5 and S1 end plates." (R. at 133.)

At a follow-up appointment on January 2, 2003, Dr. Villare ordered additional x-rays and another MRI of the Plaintiff. (R. at 136-38.)  The x-ray films indicated a "slip of L5 over S1 of approximately 60%." (R. at 137.)  The MRI revealed evidence of motion and Dr. Villare recommended surgery to stabilize the vertebra and that Plaintiff avoid activities which aggravate her

14

symptoms, including work. (Id.)

The Plaintiff was referred to Dr. Alexander R. Vaccaro, M.D., who, after examining the Plaintiff, also recommended surgery. (R. at 140-59.)  On April 28, 2003, Dr. Vaccaro operated on the Plaintiff, performing a "posterior lumbar L4-S1 fusion with attempted body decompression" and "decompression of the L4, L5, and S1 nerve roots." (R. at 140, 147.)  After surgery, Plaintiff was examined by Dr. T.J. Citta-Pietrolungo, D.O., on Sept 8, 2003. (R. at 190-95.)  Plaintiff informed the doctor she was experiencing numbness and stiffness across her back. (R. at 190.)  Dr. Citta-Pietrolungo examined Plaintiff and discovered evidence of lumbar fusion. (R. at 192.)  The doctor's report stated that Plaintiff could "heel walk, toe walk, squat and recover" and that her gait was independent without an assistive device. (Id.)  The doctor's notes also indicate the Plaintiff's "pinch and fine coordination were intact and bimanual activities were independent for activities of daily living." (Id.)

In October 2003, the Plaintiff received acupuncture treatments from Dr. M. Kyu Chung, M.D. (R. at 218-23, 232-324.)  Dr. Chung's documentation of each session indicates the Plaintiff experienced improvement of specific pain since the last treatment.  These notes indicate Plaintiff showed improvement with her ability to walk (R. at 270, 306, 310), began taking yoga again in December 2003 (R. at 306), and generally was able to

exercise longer. (R. at 234-324.)  In addition, Plaintiff
reported to Dr. Chung that the acupuncture lessened her anxiety
(R. at 240.) and gave her more energy (R. at 314-20.)  Some of
Dr. Chung's notes indicate the Plaintiff had mixed results with
acupuncture treatment, but in general, Dr. Chung's notes state
that Plaintiff's condition was improving. (R. at 260-76, 282,
294, 302, 320.)  In July 2004, Plaintiff indicated that she was
feeling "50% better" since the last treatment. (R. at 268.)

     On April 28, 2005, Dr. Chung completed a lumbar spine
residual functional capacity questionnaire indicating that
Plaintiff has daily back pain with stiffness and reduced range of
motion and that standing and weather conditions increase her
pain. (R. at 219-20, 222.)  Dr. Chung stated that the Plaintiff
is only able to carry/lift ten pounds, occasionally twist and
scoop, stand/walk/sit less than two hours in an eight hour work
day. (R. at 221-22.)  In addition, the questionnaire states the
Plaintiff can sit for 30 minutes at one time, stand for 20
minutes at one time, needs to walk for 20 minutes every 30
minutes, and needs to lie down and elevate legs 50% of the time
in an eight hour workday. (R. at 221.)  The questionnaire also
confirmed that Plaintiff has no significant limitations on
reaching, handling, or fingering and needs no assistive device
for ambulation. (R. at 221-22.)  Dr. Chung indicated the
Plaintiff would be unlikely to be absent from work more than four

16

days per month due to her impairments. (R. at 221.)

Finally, the Plaintiff's physical condition was evaluated by a Dr. Isabella Rampello, M.D., who was employed by a State agency as part of the disability application process. (R. at 210-17.)  The agency's "Physical Residual Functional Capacity Assessment" indicated that Plaintiff was capable of light functional work based on her ability to lift some objects under ten pounds and sit for about six hours during an eight hour work day. (R. at 211-12.)  Dr. Rampello found that Plaintiff's subjective complaints of constant lower back pain were inconsistent with the objective medical evidence. (R. at 215.)

c. Leg Injury

Plaintiff's medical records indicate she has a physical impairment relating to the fracture of her right leg femur in the past.  During the consultative examination with Dr. Citta-Pietrolungo, the Plaintiff discussed the pain in her right leg. (R. at 190-95.)  Dr. Citta Pietrolungo's records indicate the Plaintiff stated she had a right femur fracture "that required IM rodding." (R. at 190.)  Plaintiff complained that a screw protrudes from the rodding and causes discomfort, that her right leg is shorter than her left, and that she has difficulty walking. (Id.)  In addition, the Plaintiff told Dr. Citta Pietrolungo that she has occasional knee swelling and difficulty climbing stairs. (Id.)

17

On physical examination, Dr. Citta Pietrolungo reported that Plaintiff's right leg is one-quarter inch shorter than her left leg. (R. at 191.)  The doctor noted a decrease in muscle bulk of vastus lateralis tendon on the right and one-quarter inch atrophy of the right calf and right thigh compared to the left. (Id.)  In addition, the report indicates decreased sensation regarding the right knee and that the Plaintiff complains of occasional right knee swelling and pain. (R. at 190-91.)  Dr. Citta Pietrolungo then tested the Plaintiff's reflexes and found deep tendon reflexes were 3+/4 in the biceps, patella, and right Achilles tendon and 4+/4 in the left Achilles tendon. (R. at 192.)

## II. Discussion

A.   Standard of Review

Under 42 U.S.C. § 405(g), Congress provided for judicial review of the Commissioner's decision to deny a complainant's application for Disability Insurance Benefits.  See Ventura v. Shalala, 55 F.3d 900, 901 (3d Cir. 1995).  A reviewing court must uphold the Commissioner's factual decisions where they are supported by "substantial evidence."  42 U.S.C. §§ 405(g), 1383(c)(3); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001); Sykes v. Apfel, 228 F.3d 259, 262 (3d Cir. 2000); Williams v. Sullivan, 970 F.2d 1178, 1182 (3d Cir. 1992).  Substantial evidence means more than "a mere scintilla."  Richardson v. Perales, 402 U.S. 389, 401 (1971)(quoting Consolidated Edison Co.

V. NLRB, 305 U.S. 197, 229 (1938)).  It means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Id.  The inquiry is not whether the reviewing court would have made the same determination, but whether the Commissioner's conclusion was reasonable.  See Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988).  Indeed, the "substantial evidence is deferential and includes deference to inferences drawn from the facts if they, in turn, are supported by substantial evidence." Shaudeck v. Comm'r, 181 F.3d 429, 431 (3d Cir. 1999).

A reviewing court has a duty to review the evidence in its totality.  See Daring v. Heckler, 727 F.2d 64, 70 (3d Cir. 1984). "[A] court must 'take into account whatever in the record fairly detracts from its weight.'" Schonewolf v. Callahan, 972 F. Supp. 277, 284 (D.N.J. 1997) (quoting Willbanks v. Secretary of Health & Human Servs., 847 F.2d 301, 303 (6th Cir. 1988) (quoting Universal Camera Corp. V. NLRB, 340 U.S. 474, 488 (1951)).

The Commissioner "must adequately explain in the record his reasons for rejecting or discrediting competent evidence." Ogden v. Bowen, 677 F. Supp 273, 278 (M.D. Pa. 1987) (citing Brewster v. Heckler, 786 F.2d 581 (3d Cir. 1986)).  The Third Circuit has held that an Administrative Law Judge "must review all pertinent medical evidence and explain his conciliations and rejections." Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 122 (3d Cir.

2000).  Similarly, an ALJ must also consider and weigh all of the non-medical evidence before him.  See id. (citing Van Horn v. Schweiker, 717 F.2d 871, 873 (3d Cir. 1983); Cotter v. Harris, 642 F.2d 700, 707 (3d Cir. 1981).

The Third Circuit has held that access to the Commissioner's reasoning is indeed essential to a meaningful court review:

> Unless the [Commissioner] has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.

Gober v. Matthews, 574 F.2d 772, 776 (3d Cir. 1978).  A district court is not "empowered to weigh the evidence or substitute its conclusions for those of the fact-finder."  Williams, 970 F.2d at 1182.  However, an ALJ need not explicitly discuss every piece of relevant evidence in his or her decision.  See Fargnoli v. Massanari, 247 F.3d at 42.

Moreover, apart from the substantial evidence inquiry, a reviewing court is entitled to satisfy itself that the Commissioner arrived at his decision by application of the proper legal standards.  Sykes, 228 F.3d at 262; Friedberg v. Schweiker, 721 F.2d 445, 447 (3d Cir. 1983); Curtin v. Harris, 508 F. Supp. 791, 793 (D.N.J. 1981).


B.   Standard for Disability Insurance Benefits

20

The Social Security Act defines "disability" for purposes of an entitlement to a period of disability and disability insurance benefits as the inability to engage in any substantial gainful activity by reason of any medically determinable physical and/or mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months.  See 42 U.S.C. § 1382c(a)(3)(A) (2006).  Under this definition, a claimant qualifies as disabled only if his physical or mental impairments are of such severity that he is not only unable to perform his past relevant work, but cannot, given his age, education, and work experience, engage in any other type of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.  See 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner has promulgated regulations for determining disability that require application of a five-step sequential analysis.  20 C.F.R. § 404.1520.  This five-step process is summarized as follows:

1.   If the claimant currently is engaged in substantial gainful employment, he will be found "not disabled."

2.   If the claimant does not suffer from a "severe impairment," he will be found "not disabled."

21

3.  If the severe impairment meets or equals a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1 <u>and</u> has lasted or is expected to last for a continuous period of at least twelve months, the claimant will be found "disabled."

4.  If the claimant can still perform work he has done in the past ("past relevant work") despite the severe impairment, he will be found "not disabled."

5.  Finally, the Commissioner will consider the claimant's ability to perform work ("residual functional capacity"), age, education, and past work experience to determine whether or not he is capable of performing other work which exists in the national economy.  If he is incapable, he will be found "disabled."  If he is capable, he will be found "not disabled."

20 C.F.R. § 404.1520(b)-(f).  Entitlement to benefits is therefore dependent upon a finding that the claimant is incapable of performing work in the national economy.

This five-step process involves a shifting burden of proof. <u>Wallace v. Sec'y of Health & Human Servs.</u>, 722 F.2d 1150, 1153 (3d Cir. 1983).  In the first four steps of the analysis, the burden is on the claimant to prove every element of his claim by a preponderance of the evidence.  <u>Id.</u>  In the final step, the Commissioner bears the burden of proving that work is available for the plaintiff: "Once a claimant has proved that he is unable to perform his former job, the burden shifts to the Commissioner to prove that there is some other kind of substantial gainful employment he is able to perform." <u>Kangas v. Bowen</u>, 823 F.2d 775, 777 (3d Cir. 1987).  <u>See</u> <u>Olsen v. Schweiker</u>, 703 F.2d 751, 753 (3d Cir. 1983).

Here, ALJ Garrety determined that Plaintiff has not been under a disability, as defined in the Social Security Act as amended, at any time since her alleged onset date of disability, i.e., December 30, 2002, through the date of the decision.  At step one, the ALJ found that the Plaintiff has not engaged in substantial gainful activity since the onset of the alleged disability.  At step two, Judge Garrety found that Plaintiff's anxiety disorder is not a "severe" impairment, as defined in the Social Security Act and Regulations.  The ALJ did determine that Plaintiff's back and right knee conditions constituted a severe impairment based upon the requirements of the regulations.  20 C.F.R. §§ 404.1521; 416.921.  However, the ALJ determined at step three that neither impairment, nor the combination of impairments, meet or equal the criteria of an impairment under 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "Listing.")  At step four, the ALJ found that Plaintiff did not retain the residual functioning capacity to perform the requirements of her past relevant work as a cocktail waitress in a casino, but in step five, concluded Plaintiff had the "residual functional capacity" to perform work that existed in significant numbers in the national and regional economy.  Therefore, the ALJ concluded that Plaintiff was not "disabled."

    C.   <u>Plaintiff's Arguments</u>

Plaintiff makes several arguments why the ALJ's conclusion

that Plaintiff was not eligible for disability benefits was
erroneous.  First, Plaintiff argues that the ALJ's finding that
the Plaintiff does not have a "severe" psychological impairment
is not supported by substantial evidence.  Second, Plaintiff
argues the ALJ's finding that the Plaintiff's "severe"
impairments do not meet or equal a listed impairment in 20
C.F.R., Part 404 is not supported by substantial evidence.
Third, Plaintiff contends that ALJ Garrety rejected the opinion
of Dr. Chung and found little credibility in Plaintiff's
subjective complaints of pain and that both decision were not
supported by substantial evidence.  Fifth, Plaintiff argues that
the ALJ improperly relied on a Vocational Expert's testimony
about the availability of jobs for employees capable of
performing sedentary work.

> 1.   Whether the ALJ's finding that Plaintiff's mental
> impairment was not severe is supported by
> substantial evidence.

Plaintiff argues the ALJ's determination that Plaintiff's
anxiety disorder did not constitute a "severe" impairment was in
error because the ALJ's conclusion was not based on substantial
evidence.  Plaintiff contends she met the low burden of proof for
demonstrating a "severe" impairment for her anxiety disorder
through objective medical evidence in the record.

Plaintiff's argument is unpersuasive.  In her brief,
Plaintiff suggests the ALJ did not properly support a factual

finding by substantial evidence.  However, Plaintiff attempts to demonstrate this by arguing the low burden of proof for a Plaintiff in step two analysis.  These are two separate arguments: one argues the ALJ applied an improper legal standard, and the other argues the ALJ does not have substantial evidence to support the factual finding at step two.

This Court will first address Plaintiff's argument that the ALJ applied the wrong legal standard.  Step Two analysis, according to Plaintiff, "is not an exacting one" and any doubt as to the severity of an impairment should be resolved in favor of the applicant. (Pl. Br. at 14.)  Plaintiff argues that the ALJ applied an improper standard because "[t]he step-two inquiry is a de minimis screening device to dispose of groundless claims." Newell v. Comm'r of Soc. Sec., 347 F.3d 541, 546 (3d Cir. 2003). Therefore Plaintiff urges this Court to review "with close scrutiny" the ALJ's decision at step two that the Plaintiff's anxiety disorder was not a "severe" impairment. (Pl. Br. at 14.)

To demonstrate that she has a "severe" impairment, Plaintiff must show her impairment is more than a slight abnormality and that the impairment significantly limits her ability to work. Social Security Administration regulations discuss step two by defining what is not a "severe" impairment.  The regulations state an impairment which does not "significantly limit[] [the Plaintiff's] physical or mental ability to do basic work

25

activities" does not constitute a severe impairment.  20 C.F.R.
§§ 404.1520(c); 404.1521(a)(2006); see also Newell, 347 F.3d at
546 (applying the regulatory definition to step two analysis).
Basic work activities are defined as "abilities and aptitudes
necessary to do most jobs, including, for example, walking,
standing, sitting, lifting, pushing, pulling, reaching, carrying
or handling." Newell, 347 F.3d at 546 (quoting 20 C.F.R. §
140.1521(b) (2006)).  However, the Plaintiff's impairment should
be considered "severe" if the plaintiff proves it is something
beyond a "slight abnormality or combination of slight
abnormalities." Bowen v. Yuckert, 482 U.S. 137, 158 (1987)
(O'Connor, J., concurring).  As the Third Circuit stated in
Newell, "[o]nly those claimants with slight abnormalities that do
not significantly limit any 'basic work activity' can be denied
benefits at step two." 347 F.3d at 546 (citing Justice O'Connor's
concurrence in Bowen, 482 U.S. at 158).  The Third Circuit has
instructed that "if the evidence presented by the claimant
presents more than a 'slight abnormality,' the step-two
requirement of 'severe' is met, and the sequential evaluation
process should continue." Id.

        Here, the ALJ held that Plaintiff's anxiety disorder did not
reach the regulatory requirements of a "severe" impairment.  In
doing so, Judge Garrety applied the proper standard under 20
C.F.R. § 404.1520 for determining if an impairment is medically

severe.  The anxiety disorder is not "severe," according to the ALJ, because it does not "have more than a minimal effect" on Plaintiff's mental ability to do basic work activities. (R. at 15.)  Judge Garrety did not express any reasonable doubt or that Plaintiff had a high burden to meet.  Instead, the ALJ applied the <u>de</u> <u>minimis</u> legal standard for a "severe" impairment: something more than a slight abnormality that significantly limits her ability to work. Therefore, the Plaintiff's argument that the ALJ applied a more stringent legal standard does not succeed.

Having decided the proper legal standard was applied, this Court now addresses whether the step two analysis is based on substantial evidence.  The ALJ is required to consider all the evidence in the record and, as the ultimate finder of fact, may weigh the credibility of the evidence. <u>Burnett</u>, 220 F.3d at 122. The reviewing court has a duty to review the evidence in its totality. <u>Daring v. Heckler</u>, 727 F.2d 64, 70 (3d Cir. 1984).  The ALJ, however, must provide an adequate explanation for disregarding evidence. <u>See</u> <u>Adorno v. Shalala</u>, 40 F.3d 43 (3d Cir. 1994); <u>see</u> <u>also</u> <u>Burnett</u>, 220 F.3d at 122.

In this instance, the ALJ's step two decision is based on objective medical evidence from the treating physician, consulting physician who examined Plaintiff, and a non-examining State agency physician who reviewed Plaintiff's medical records.

As the treating physician, Dr. Camacho's findings would be entitled to more weight than other medical opinions. See Adorno, 40 F.3d 43. However, no opinion or findings about the severity of Plaintiff's anxiety disorder were submitted for Dr. Camacho. (R. at 160-84, 224-29.) Instead, Plaintiff introduced records of her history with Dr. Camacho. (Id.) The ALJ reviewed the notes from Dr. Camacho and found they indicated that Plaintiff still suffered from anxiety, but had responded well to the treatment regimen of Prozac and Xanax. (R. at 16.) The ALJ pointed out that Dr. Camacho's notes indicate the Plaintiff was stable, completely off Prozac by February 2004, and consistently denying depression. (R. at 16-17.) The doctor's records also state that Plaintiff experienced trouble sleeping in early 2004, but was doing better by the summer, reported no side-effects, and was in stable condition. (R. at 17.)

The ALJ did not accord significant weight to the findings of Dr. Mintzer, the consulting physician who examined Plaintiff as part of the disability determination process. (R. at 16.) Judge Garrety found Dr. Mintzer's GAF score and mental status findings were not supported by Dr. Mintzer's report. (Id.) Specifically, the ALJ pointed to the doctor's statement in the report that the claimant's limitations were due primarily to her physical health problems and the notes about the Plaintiff's ability to socialize, concentrate on television, finish what she starts, and

28

follow instructions. (Id.)

The ALJ noted that during Dr. Mintzer's testing, the Plaintiff expressed feeling pressured.  However, given the doctor's report on the Plaintiff's clarity and mental abilities during the rest of the testing, the ALJ found the difficulties appeared to be related to discomfort in the testing situation. (R. at 16.)  As a result, the ALJ found Dr. Mintzer's findings and GAF score should not be given significant weight.  Finally, the ALJ considered the non-examining State agency physician's evaluation that the Plaintiff's anxiety was a non-severe impairment.  Finding the State agency's assessment to be consistent with the evidentiary record of Dr. Mintzer's and Dr. Camacho's notes, the ALJ gave the non-examining report considerable weight. (R. at 18.)

Plaintiff's claim that the ALJ's step two analysis is not based on substantial evidence fails due to the ALJ's lengthy discussion of what facts were considered and what weight the facts were given in reaching her conclusion.  Judge Garrety did not reject Dr. Mintzer, but instead accorded less weight to the doctor's findings as a result of the conclusion's inconsistency with the notes from the treating physician, the opinion of the non-examining State agency physician, and Dr. Mintzer's own notes.  Indeed, Judge Garrety found that Plaintiff's anxiety disorder did not constitute a "severe" impairment at step two of

29

the analysis based on substantial evidence of the Plaintiff's
ability to function without much assistance.

        2.   <u>Whether the ALJ's Conclusion that Plaintiff's
           Conditions Do Not Meet the Requirements of the
           Listing of Impairments was Supported by
           Substantial Evidence.</u>

Plaintiff's second claim is that the ALJ's decision fails to
provide a rationale for finding the Plaintiff's impairments did
not meet the requirements of the Listing for Step Three analysis.
The Plaintiff argues that this Court should reverse the ALJ's
decision because the analysis at step three consists of little
more than a conclusory statement.

An ALJ must provide sufficient rationale for denying a
disability claim at step three to ensure the possibility of
meaningful judicial review. <u>See</u> <u>Burnett v. Comm'r Soc. Sec.
Admin.</u>, 220 F.3d at 119 (3d Cir. 2000); <u>see also</u> <u>Cotter v.
Harris</u>, 642 F.2d 700, 704-05 (3d Cir. 1981) (reasoning that
accurate appellate review of ALJ decisions requires a statement
of reasoning or findings).  In <u>Burnett</u>, the Third Circuit
reversed the ALJ's denial of the Plaintiff's claim at step three
because the decision contained no rationale and was merely a
"conclusory statement". 220 F.3d at 119-20 (remanding for an
explanation of why the Plaintiff's back and knee impairments were
not equivalent in severity to one of the listed impairments).
Reasoning that the ALJ's failure to provide any rationale left

30

the ALJ's decision "beyond meaningful judicial review," the Third Circuit vacated the ALJ's decision and remanded for a discussion of the evidence supporting the ALJ's finding at step three. Id. at 120.   However, the ALJ's rationale does not require particular language or have to adhere to a particular format as long as it provides "sufficient explanation to provide meaningful review of the [] determination." Jones v. Comm'r of Soc. Sec. Admin., 364 F.3d 501, 505 (3d Cir. 2004)(finding sufficient explanation where the ALJ evaluated the medical evidence in the record and set forth that evaluation in the opinion).

Here, Judge Garrety's step three analysis contains a thorough discussion of the medical evidence in the record and the particular step three listings which were being used to analyze the Plaintiff's impairments. (R. at 17.)  The ALJ explained that the Plaintiff's spinal, femur, and anxiety conditions did not meet or equal the requirements of listings at 20 C.F.R. § 404 Sub. P, App. 1, 1.04 (Disorders of the spine), 1.06 (Fracture of the femur), and 12.06 (Anxiety-related disorders.) (R. at 17.) In addition, the ALJ explained her conclusion that the Plaintiff's claims did not equal these listings, stating that "no objective medical evidence in the record [] satisfies the specific criteria of these listings." (Id.)   Judge Garrety further explained that no evidence in the record demonstrated "an inability to ambulate without the use of an assistive device,"

31

compromise of the nerve root or spinal canal, spinal arachnoiditis, repeated episodes of decompression, or complete inability to function independently. (Id.)  Additionally, the ALJ stated no clinical evidence existed that "the right femur fracture is not solid," atrophy regarding the right leg was minimal, the Plaintiff had some reduced lumbar spine range of motion, but a normal range of neck and extremity range of motion, and normal muscle strength in the right knee. (Id.)

Plaintiff suggests that such evidence is discussed in conclusory terms and therefore does not provide sufficient rationale for step three analysis.  This argument is unpersuasive.  The ALJ is not required to provide step three analysis according to a particular format. See Jones, 364 F.3d at 505.  Under Jones and Barnhart, the ALJ is only required to provide a sufficient rationale for her decision in step three so a reviewing court may provide meaningful analysis.  ALJ Garrety's opinion provides the required analysis - providing numerous pieces of medical evidence demonstrating Plaintiff's physical and psychological conditions do not meet the requirements in the listings of impairments.  While Judge Garrety did not lay out each piece of medical evidence in contrast to the requirements under the listing of impairments, her decision reflects far more than mere conclusory statements.  The long list of medical evidence and discussion of why this evidence does not meet the

requirements of the individual listings is a sufficient rationale for the ALJ at step three analysis.

      3.   <u>Whether the ALJ's determination of Plaintiff's Residual Functional Capacity properly considered the Treating Physician's Opinion and the Plaintiff's subjective complaints of pain</u>

Once the ALJ determined that Plaintiff did not meet the Listing of Impairments, the ALJ analyzed whether Plaintiff could work her former position as a cocktail waitress (Step Four). Considering Plaintiff's trouble standing for long periods of time and general lower back pain, the ALJ found the Plaintiff was unable of returning to work at the casino as a cocktail waitress.

The ALJ then analyzed whether work existed in the national community that would accommodate Plaintiff's residual functional capacity.  The first part of this analysis is determining Plaintiff's residual functional capacity due to the "severe" physical limitations she has from her spinal and femur conditions.

Plaintiff claims the ALJ erred in formulating Plaintiff's "residual functional capacity" because the ALJ (1) improperly rejected the opinion of the treating physician, Dr. Chung, and (2) did not properly take into account the Plaintiff's subjective complaints of pain.  Plaintiff first claims that the ALJ rejected the opinion of the treating physician without substantial evidence to justify the decision.  Secondly, the Plaintiff argues

33

the ALJ discounted the Plaintiff's subjective complaints of pain based on the rejection of the treating physician.

The medical findings from a treating physician are generally given controlling weight if "well supported by medically acceptable clinical and laboratory diagnostic techniques and [] not inconsistent with the other substantial records in [the] case record." 20 C.F.R. §§ 404.1527(d)(2); 416.926(d)(2) (2006); see also Mason v. Shalala, 994 F.2d 1058, 1067 (3d Cir. 1993) (reasoning courts "must give greater weight to the findings of a treating physician"). However, an ALJ is not bound to accept the opinion of a treating physician without weighing it against the other medical evidence of record. See Kent v. Schweiker, 710 F.2d 110, 115 n.5 (3d Cir. 1983). An ALJ "may afford a treating physician's opinion more or less weight depending on the extent to which supporting explanations are provided." Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999). However, should an ALJ choose to reject the opinion of a treating physician, he or she must provide an explanation for why the opinion was rejected or discounted.

At the same time, the Third Circuit warned that an ALJ "may reject a treating physician's opinion outright only on the basis of contradictory medical evidence. . . ." Plummer, 186 F.3d at 429.

Here, the question is whether ALJ Garrety's treatment of Dr.

34

Chung's medical opinion was a rejection of the treating physician's opinion outright or merely a decision to accord the opinion less weight.  In determining the Plaintiff's residual functional capacity, the ALJ considered all of the medical evidence in the record -- both the medical findings and opinions of the physician and the physicians' medical notes.  In his decision, the ALJ noted that he found Dr. Chung's opinion unsupported by the doctor's own notes. (R. at 21.)  Specifically, Dr. Chung's notes showed the Plaintiff's complaints of back pain, lack of energy, and lack of mobility were improving with treatment. (R. at 233-321.)  Dr. Chung's notes indicate the Plaintiff expressed "50% improvement" in July 2004 (R. at 268.) and a reduction in discomfort. (R. at 260-76, 282, 294, 302, 320.)  Therefore, Judge Garrety stated in the opinion that Dr. Chung's opinion was "not supported by [his] own treatment records" and, therefore "given little weight." (R. at 21.)  In doing so, the ALJ did not reject Dr. Chung's opinion outright, but, instead, concluded that Dr. Chung's medical opinion on Plaintiff's ability to work was entitled to less weight.  Such a decision was supported by substantial evidence that Dr. Chung's opinion was not supported by the doctor's notes.

Plaintiff also argues that the ALJ did not properly consider the Plaintiff's subjective complaints of pain.  Subjective complaints of pain must be accompanied by medical signs and

laboratory findings which show that the claimant has a medical impairment which could reasonably be expected to produce the pain or other symptoms alleged. See <u>Bittel v. Richardson</u>, 441 F.2d 1193, 1195 (3d Cir. 1971). However, the ALJ is required to give serious consideration to the claimant's subjective complaints of pain, even if those assertions are not fully confirmed by the objective medical evidence. See <u>Welch v. Heckler</u>, 808 F.2d 264, 270 (3d Cir. 1986).

If a medical impairment exists which can be determined to produce pain, the intensity and persistence of symptoms must also be evaluated in order to determine how they might limit a claimant's ability to work. See 20 C.F.R. § 404.1529(c)(1) (2006). It is within the ALJ's discretion "to evaluate the credibility of a claimant and to arrive at an independent judgment in light of medical findings and other evidence regarding the true extent of the pain alleged by the claimant." <u>Brown v. Schweiker</u>, 562 F. Supp. 284, 287 (E.D. Pa. 1983). Thus, on review, the reviewing court must consider whether the ALJ's findings with regard to subjective complaints of pain are supported by substantial evidence. See <u>Dumas v. Schweiker</u>, 712 F.2d 1545 (N.Y. Ct. App. 1983).

Decisions on the credibility of witnesses are within the purview of the ALJ, as the finder of fact. This Court, then, as it must, declines to substitute its own determination of

credibility for that of the ALJ, given that the ALJ had the
opportunity to observe the Plaintiff first-hand. See Weir v.
Heckler, 734 F.2d 955, 962 (3d Cir. 1984) (recognizing great
deference is given to the ALJ's determination of credibility).
An ALJ may base credibility determinations on various factors,
including the objective medical evidence, the Plaintiff's ability
to engage in daily activities, and whether the Plaintiff is
taking medication prescribed for pain.  See Welch, 808 F.2d at
270 (finding complaints of pain unpersuasive given Plaintiff's
failure to take pain medication).

     Here, the ALJ found the Plaintiff's subjective complaints of
pain were not supported by the objective medical evidence. (R. at
18-19.)  In her opinion, ALJ Garrety engaged in lengthy
discussion of the medical evidence that the Plaintiff had spinal
and femur conditions. (Id.)  In addition, the ALJ considered the
Plaintiff's testimony that she independently goes to the gym
several times a week, walks on a treadmill for 30 minutes at a
time, practices yoga, drives herself for short distances, runs
errands, cares for her dog, shops for groceries, cooks for
herself, socializes with friends 1-2 times a month, and took a
trip to Atlantic City with her grandmother. (R. at 19.)  Also,
the ALJ considered the Plaintiff's testimony that she does not
take her pain medication because it makes her head cloudy.  Both
the medical evidence and the Plaintiff's testimony about her

activities led the ALJ to conclude that the Plaintiff retained the ability to perform sustained work activity.  Such a determination is based on substantial evidence given the medical evidence, Plaintiff's ability to engage independently in daily activities, and her ability to decide not to take pain medication.

4.   Whether the ALJ Properly used the Vocational Expert Regarding Whether Employment Existed for Someone with Plaintiff's Limitations

In her final claim, Plaintiff argues that the ALJ improperly used the Vocational Expert, because the hypothetical asked to the Vocational Expert only included the Plaintiff's impairments which were determined to be "severe" and only included the physical complaints which the ALJ had found to be credible.

At the fifth step of disability determination analysis, the ALJ may choose to utilize a Vocational Expert and pose a hypothetical based on the Medical-Vocational guidelines and the Plaintiff's impairments.  An ALJ is not required to pose a hypothetical consisting of every impairment or condition alleged by the Plaintiff.  Instead, the hypothetical must consist of all the limitations which the ALJ found were credibly suffered by the claimant.  See Plummer, 186 F.3d at 431.  A hypothetical consisting of all credible impairments "can be relied upon as substantial evidence supporting the ALJ's conclusion that a Plaintiff is not totally disabled." Id. See also Chrupcala v.

38

<u>Heckler</u>, 829 F.2d 1269, 1276 (3d Cir. 1987).

Here, the ALJ first turned to the Medical-Vocational guidelines to determine what level of work, if any, the Plaintiff would be able to perform.  Considering all the credible complaints and determined impairments, the ALJ found the Plaintiff was capable of sedentary work.  Judge Garrety then posed a hypothetical based on Plaintiff's age, education, work history, and capabilities based on the Medical-Vocation guidelines.  Based on those criteria, the VE found various jobs existed in the national and regional economy for someone with the Plaintiff's skill and limitations.  Accordingly, the ALJ properly formulated and asked a hypothetical to the VE and the resulting conclusion that the Plaintiff was not disabled is based on substantial evidence.

## III.   <u>CONCLUSION</u>

For the reasons stated above, the Commissioner's finding that Plaintiff is not disabled will be affirmed. The accompanying order will be entered.


**September 28, 2006**                    **s/ Jerome B. Simandle**
DATE                                      JEROME B. SIMANDLE
                                          United States District Judge